Okay, thank you. The next matter is Ramos de Silva v. Attorney General. Good morning, Your Honor. I am Thomas Griffin. I represent the petitioner, Rudy Milla Ramos de Silva. Speak up a little bit, all right? I've reserved three minutes. I've asked for rebuttal. I think what the Board of Immigration Appeals gave us in this case was a results-oriented decision, but it failed to give us an understanding of the case, of the situation under VAWA and the forgiveness provision. I think probably their main reason that I haven't argued before, and neither party has, is that they misinterpreted the statute. If you haven't argued it before, was this presented to the BIA or the IJ, what you're about to argue? Well, no, this is in the arguments over ambiguity that weren't brought up until this court. In just looking at the statute this morning, it says that forgiveness can happen if the AG finds that the act or conviction was connected to the aliens having been battered or subjected to extreme cruelty. By a U.S. citizen. It's the battering and the cruelty that has to be connected to her bad act, and in this case the punching in the nose. And what the BIA did is try to connect the batterer to the event. So it's the suffering, it's the cruelty. It's what I had raised in my letter brief in the Ninth Circuit's Fernandez case, where they very succinctly set out that women in abusive relationships have a constellation of behaviors and psychic sort of injuries and trauma that most people don't understand or the lay person doesn't understand. To me, I'm not sure. I guess you can understand it. But how no matter what definition of connected to one looks at, it's hard for me to understand how the punch in the nose was not connected to the underlying abuse and was driven by it. Obviously, I completely agree, Your Honor. But I think what the BIA did that made it, if we could sort of maybe forgive them a little bit, is they tried to connect the man when the statute says, very specifically, it's the cruelty. It's what happens to her in the event that makes her, causes problems. For example, an abusive husband or batterer could have abandoned her and took off. What we need to look at is connected to. And is that ambiguous or not ambiguous? Well, it's not. It's not ambiguous in the least. And I think the BIA was just trying to connect, connect the man rather than connect the syndrome of problem. Why worry about that when you can simply argue that the phrase is not ambiguous? I have argued that from the very beginning. I'd like to hear that argument. Connected to is, I think we all know what connected to means, as Your Honor, Judge McKee just said. I mean, from childhood, we say the shin bones connected to the knee bone. We know what it means. The shin bone may not be connected to the head bone. But this case, I think a good lawyer could probably connect the two. But the shin bone isn't connected to your eyes. Shinbone. There is a limit. There is a limit. I don't know me that well. I think what the government had said, you don't have to get that esoteric. Here's just what I said. It's not connected. It's not. What the government had said is, is, is that there needs to be limits. And this is an indeterminate definition. But there are limits there. You can only go so far and things become disconnected. And this is a very connected case. Well, the IJ specifically said that it was the result of her anger toward her husband's infidelity and concluded that because of his infidelity, she was the victim of extreme cruelty. So it seems the IJ did connect it. But then it wanted to throw in the encouragement and the inducement. Well, I think that I mean, that's I mean, I obviously think there's as connected as could be a cause and effect. Anyway, you want to look at it. And what they did was and said, we find it's not connected. And they didn't say it's ambiguous. They said it's not connected because he didn't encourage it. Again, he he didn't compel her to do it. He didn't coerce her to do it. She did not do it on behalf of him. And she didn't ask for him to do it. Those were the redefinitions that the Board of Immigration Appeals used to define connected without saying so. To me, they're looking at the Yates memo to find these words. They must establish experience compelled or coerced him to commit. But then the next sentence of the Yates memo says, in other words, the evidence should establish that the self petitioner would not have committed the act of crime in the absence of the battering or extreme cruelty. Then it gives kind of a but for a test that I obliterates the idea again connected to. Again, your honor, I don't know sort of why it got this far. I is there any is there any deference, any agency deference or Chevron that's implicated by this? This whole issue? I think I think Chevron one says is it ambiguous? And of course, our argument from the beginning is that it's not ambiguous at all. We all know what connected to means and we know the limits of connected to the government, of course, as it is ambiguous. And so the agency, what is connected to implicate immigration policy in any way? It's not like persecution or something else that would have a relationship to the agency. It's a phrase that's used everywhere. You know, isn't that a sort of phrase that the courts are expert in interpreting? It's a it's related to causation and and it's something that courts interpret all the time. But it really has nothing to do with immigration policy. I absolutely agree. I think we're I think, as I said at the beginning, they had they wanted to the issue that results oriented definition. And it's how do we get another deportation checkmark? Basically, that's what we're up against in the last couple of years and increased numbers. So if they wanted to, it's an absurd definition of connected to. No one would define connected to as something that someone compels you to do, coerces you to do or ask you to do it on behalf of. And what's really sort of ironic with this very customized definition is it eliminates him as a victim. Because if she turned instead of punching the mistress and she punched him, it would have been absurd because he wouldn't encourage it or ask her to punch me in the nose. But they've so defined this that it that the abuser himself could be compelled. But you've got a lot more time left. I think I know we're seeing your argument. I'm kind of anxious to hear what Mr. Stewart's response. Thank you, Your Honor. May it please the court. I'm Scott Stewart on behalf of the attorney general. I'd submit your honor. But but you want us remanded. Why? Because because the word connected to the phrase connected to is ambiguous. Your Honor, it is one of those words of potentially are very expansive, potentially indeterminate meaning. You do is indeterminate. Yes, Your Honor. I mean, anything that's indeterminate is ambiguous. Not necessarily, Your Honor. What I what I'm getting at here is that the word connected to here arises in the context of an exception to a general rule barring this sort of cancellation of removal. So it comes up in a context of the good moral character context where the board immigration judges are frequently called upon to to administer a good character type analysis. And they're they need to consider just other areas about, you know, somebody has a criminal conviction. How does the general bar. How does that tie in with the meaning of the word connected to. Well, Your Honor, the Supreme Court has recognized that when faced with these broad terms related to in connection with those kinds of terms, you have a problem where the term could encompass anything that's probably heightened here because we have an exception. What's the problem with that? And that's what Congress meant. It's possible that Congress could mean that, Your Honor. But the Supreme Court has pointed to the need to look not just to the bare language, but to make sure when you have a very broad definition like that, you also look to the structure of the act, the context of the act. Which I think we agree with, but that doesn't render it ambiguous. And indeed, in this, I think the supplemental letter that the appellant sent pointed out that in this very statute, they can use the word substantially connected to and then in another area limited the temporal connection of something. So if we're looking at the context, the fact that Congress knew how to limit connections in other areas points to the fact that connected to here has its ordinary meaning, and it doesn't require a substantial connection, doesn't require a temporal connection. And as Judge Roth points out, we interpret related to, connected to, in accordance with. I mean, all these terms, we do that all the time. The Court does interpret those kinds of terms, Your Honor. What I'm submitting here, though, is that this does arise in the context of an agency who's. . . Who has no more expertise in interpreting statutes. In fact, if there's any life left whatsoever to Marbury v. Madison, they have less expertise in interpreting statutes than Article III courts of law do. I know the BIA does not agree with that proposition. We've been on that one before. But I think that's still the structure of the way the jurisprudential system works. What I would suggest, Your Honor, is that the Immigration and Nationality Act, it is a very broad, it is a very complex statute. There are. . . This is not a statute that this particular provision has gotten much hearing in the courts. All the cases that talk about why we have to defer to the expertise of the BIA as an agency talk about the unique problems involved with international relations, the unique problems of immigration, and the kinds of things that are endemic to those kinds of complexities. Here we're just talking about whether or not somebody's action was connected to a history of abuse. That's it. Now, that to me is more amenable to a family court's expertise maybe than the BIA's, but it's totally consistent with the kinds of things we do all the time. Your Honor, I would emphasize that the Supreme Court has recognized that this is a potentially. . . It's hard to define in this context where you usually have an agency that gives it the first run, where no court has opined on it. Well, if we're at a point where a court of law has to wait for an agency to tell us what the word connected to means, we are in deep doo-doo here. I don't think so, Your Honor. I mean, that's sort of the underlying understanding of what. . . If there were a phrase that the court had already decided were ambiguous, that would be a situation where it would make sense. Can we look to Webster's or to Black's Law or to American Heritage Dictionary? Would those be appropriate sources for us to look to, or should we wait and let the BIA read it and tell us what the BIA thinks Webster's and the American Heritage Dictionary and Black's Law Dictionary should tell us? I mean, Your Honor can certainly look at those. What we think those show, however, is that there is a permissible. . . under American Heritage Dictionary to join or fasten together, to unite, to associate, to consider as related. Black's Law Dictionary, something that is associated as an occurrence or idea to combine, to unite, to link together, to establish a bond or relation between the two as if connected to or joined as injunction. And we don't see encourage, induce, compel, or coerce in any way, shape, or form in any of those definitions. Your Honor. . . Where did that come from? That's all right. No, no. Where did those concepts come from that that's what connected to had to be? I mean, I think that was the brief attempt by the agency to try to make sense of it, and I agree it merits further fleshing out, Your Honor. Is that from the Yates Memo? There may be. . . I mean, there is some of the kind of, I believe. . . I believe Your Honor quoted some of it earlier, the compel language, but also the but-for type language, which, again, I think does counsel. . . But-for is extremely broad. It is extremely broad, Your Honor. But-for without any real connection. Exactly, Your Honor. In response to Judge McKee's point, and I think kind of a number of the questions here, I mean, just looking at some of those definitions, there's a difference between something being conjoined and something being associated or in a relationship with. I mean, you know, to take the kind of hip bone example, I mean, you know, two bones may be conjoined, but like two very separate bones not conjoined may be in a relationship, and it's. . . I'm so sorry. You ever started on that road? No, I'm talking about bones being in a relationship. What I'm suggesting, Your Honor, is that there is a difference between conjoined, a taut, tight relationship on the one hand, and a taut, tight nexus on one hand, and a broader relationship. Well, they could say substantial connection. And this statute does use that term in another section. So if they wanted to make it substantial connection, i.e., you know, actually attached or conjoined, it could have said substantial connection. But it said connected to. Correct, Your Honor. At one point you asked for summary affirmance in this case, right? The government did it before the Board of Immigration Appeals, Your Honor. Yes, at that point you had no problem with the definition of connected to, obviously, or you wouldn't have asked for summary affirmance. And, you know, I find it difficult to give credence to your explanations now of why you're trying to define connected to when at one point in the beginning of this case you found that there was no problem at all with connected to. Your Honor, I understand the point. The Department of Homeland Security did request summary affirmance before the agency. The Department of Justice then took over the case petition for review stage. And, you know, the evaluation was made like, look, this is a difficult, you know, as we explained in our motion to remand to the court, this is an issue that warrants more of a look. This connected to is not defined in the BIA. It's not the subject of a board decision. It's not that we found. It's not gotten a good judicial exegesis. And looking at those kinds of things, Your Honor, we made the evaluation that it would be just a better, sounder way to administer and go about this for the court to remand so the agency could have a better look at this ambiguous phrase. We didn't mean anything, you know, disingenuous or anything about that. But that was the evaluation. If we find it unambiguous, we don't have to worry about it at all. If the court finds it unambiguous and rules against us, we kind of are where we are, I think, Your Honor. Right. But I would suggest even still, if the court were not to, for the reasons we've given, and I think both the immigration judge and the Board of Immigration Appeals gave reasons why this would not fall into the connected-to definition. I'm struggling to understand why it wouldn't. How in the world is her striking out at her husband's mistress, especially under these circumstances, not related to the underlying adulterous conduct? Your Honor, the problem with that question is that it assumes the very broad, boundless view of connected-to that we've submitted. No, it doesn't. It means that she was the victim of extreme cruelty, and extreme cruelty caused her to strike out at the object of the source of the cruelty. And the I.J. specifically said this. It is a result of her anger toward her husband's infidelity, and they found that the victim of extreme cruelty was based upon his infidelity. So the I.J. basically found the facts on the connection. Your Honor, I don't think that's right. At A.R. 93, I think the I.J. was a little bit broader in the overall facts that were around there, and I think when we got to the actual event, the September 2014 day, as both elements of the agency emphasized, look, the husband, he wasn't actually there. He didn't tell her to go meet this person. He didn't encourage her. He didn't compel her. He didn't coerce her. All these things that you could see drawing a connection with the ultimate crime. He didn't assault her. He didn't direct her to assault the person. There was this attenuation in time where, you know, this was kind of a drawn-out event. Why did she do what she did? Your Honor, I- She was having a bad hair day, maybe? Your Honor, at some point in the record, she says, look, you know, I just have, I believe it's a page, you know, different pages. She said, like, you know, I have anger. My mother wasn't there. This was, you know, I had a long history of just kind of bad- Abuse. But the anger specifically found that her anger was the result. So how- If that's not a- You're saying that's not a connection? Your Honor, my, you know, we would say that in the alternative. It does not meet the requirement of connected to. It just isn't the sort of tight enough thing to meet an exception to a strong presumptive general bar. But I would suggest that the court would benefit still from the elucidation by the agency. Let me say, if my husband had taken a mistress and I found out about it, I would have punched her in the nose. And it would have been connected to my reaction to my husband doing that. Your Honor, I think we all appreciate the terrible difficulty of the situation here. I would note that the immigration judge, and, you know, through the course of the testimony, said, look, you know, I can see that you have remorse. You know, he noted for the record that she was tearing up at, you know, at least, you know, one or other points. She understood that it's-this was a-the immigration judge, I believe there were two of them at different points, recognized sympathy, acknowledged the problem. So we don't diminish that at all. We take the point, Your Honor, what we're just saying- You take the point that it's not connected to the abuse and the adultery. I think we take the point about the visceral reaction we all share to the conduct of the petitioner's husband, Your Honor. What I'm saying is that we have here this important question of law. My friend does acknowledge that it's important in his letter, but he also acknowledges that- Maybe it's too important to be left to an agency. Maybe a court of law should decide it. Your Honor, I don't doubt that this court of law will ultimately get the point, but, I mean, that's under Chevron and agency principles. Agencies take the first view of this thing. The agencies take the first definition. When you're dealing with a common word that has a common understanding and is not found to be ambiguous by the court, we don't get to the agency, do we? I take the point when you have an unambiguous word, the court is, in the first instance, able to decide that, Your Honor. I would just hit the point that we tried to bring across in our letter brief, that we deal here with one of those very, very potentially broad phrases that can be defined any of a number of ways, matters of degree, matters of different kinds of causation, different degrees of relationship. And when you have that in an overall complex statutory scheme that an agency does have significant experience in interpreting, I would submit that the prudent and best thing to do here, especially without- How does the agency have significant experience in interpreting connected to? Because- In this case, have required connected to be compelled. It gets to the point, Your Honor, that when, as the Supreme Court has said, when you have one of these broad phrases, you look, you make sure, to make sure you're not reading the phrase too broadly, you look at the statutory structure, you may look at its objectives, you look at other provisions. But if it's a broad phrase, you read it broadly, right? I think it's a question of how broadly you may read it, and that can be a question of structure, context, objectives of the statute. And those are the kinds of things, Your Honor, that I would suggest are key areas of expertise, institutional knowledge, and understanding for the agency. Institutional knowledge? Institutional knowledge to find out what connect means. Your Honor- What would have been a sufficient connection here? If she witnessed his infidelity, what would satisfy you as to the connection here? Your Honor, I can't commit to something, but if I can suggest maybe some other considerations, it's, you know, we have here a third party. I think the agency could potentially opine, you know, how do things change depending on who, say, an act is committed on, how close does the abuser need to be? I'm just hesitant to kind of step into the agency when we have just kind of this vacuum of areas. I'm just trying to figure out what's missing here, kind of have an aha moment of, oh, that's the connection we need. Can I make one or two sentences just to close that loop? Why don't you do one and then your light is on? Understood, Your Honor. I think you can kind of sense that we're not overwhelmed by your logic here. Understood, Your Honor. I would emphasize the points in our briefs, and to the extent the Court has any doubt, I think it would just confirm the benefit of remand. You can get the agency's take, and the Court would still have an opportunity. Okay, thank you. Thank you, Your Honor. Mr. Griffin? You really don't. Are you serious? I don't. Do you really want to say anything else? No, I would just ask the Court not to remand. Okay, thank you. I think they were on. We understand your argument. You're resting on your brief, and we understand that. Thank you. Thank you. Take the matter under advisement.